### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

STACY WILLIS, as Personal )
Representative of the Estate of )
MITCHELL EVERETT WILLIS, )
Deceased, )
                           )
               Plaintiff, )
                           )
v. )         Case No. CIV-18-323-D
                           )
OKLAHOMA COUNTY )
DETENTION CENTER, *et al.*, )
                           )
              Defendants. )

## ORDER

Before the Court are three summary judgment motions filed by Defendant James Daniel Newkirk [Doc. No. 129], Defendant Kody Ward [Doc. No. 121], and Defendant Tiffany Williamson [Doc. No. 123]. Plaintiff filed responses in opposition to each [Doc. Nos. 171, 161, and 163], and Defendants Ward and Williamson filed replies [Doc. Nos. 180 and 179].

Plaintiff Stacy Willis, on behalf of the estate of Mitchell Everett Willis, sued multiple defendants under 42 U.S.C. § 1983 alleging violations of Mr. Willis' rights under the United States Constitution. Plaintiff claims Defendants Newkirk, Ward, and Williamson failed to provide Mr. Willis with constitutionally adequate medical care. Defendants argue they are entitled to qualified immunity. These matters are fully briefed and at issue.

## FACTUAL BACKGROUND

This case arises out of Mitchell Everett Willis's tragic death at the Oklahoma County Detention Center. On the morning of August 18, 2017, officers escorted Mr. Willis into the detention center after he was arrested for public drunkenness and disorderly conduct. Less than twelve hours later, a detention center nurse found Mr. Willis in his cell; he was unresponsive, lying face-down in a prone position.

Earlier in his detention, Mr. Willis started a physical altercation outside a receiving cell while officers attempted to provide him lunch. It took several officers to subdue him; officers placed Mr. Willis in handcuffs and ankle shackles. They then escorted Mr. Willis to be seen by detention center medical staff, who cleared him to be taken to cell 13C-03. Mr. Willis walked to the cell under his own power.

Three officers, including Jonathan Johnson and Bryan Cornelius, escorted Mr. Willis into cell 13C-03. Once inside the cell, the officers ordered Mr. Willis to lower himself to his knees; Mr. Willis complied. Johnson and Cornelius then assisted him to his stomach. At this point, Mr. Willis was face-down in a prone position restrained by handcuffs and ankle shackles.

The officers surrounded Mr. Willis to remove the handcuffs and shackles. To keep Mr. Willis on the floor, Johnson utilized a three-point stabilization technique, which involves an officer placing his foot on the floor between a detainee's neck and shoulder and lowering his shin across a detainee's shoulder blade. During the uncuffing, Cornelius thought Johnson's knee was in an incorrect position on Mr. Willis's back; he directed

Johnson to reposition his knee. The officers removed the handcuffs and shackles, and they exited the cell.

Newkirk was the officer assigned to perform sight-checks on the 13th floor, which included Mr. Willis's cell. Newkirk began conducting sight-checks just as Officers Johnson and Cornelius left the floor. When performing sight-checks, the Oklahoma County Sherriff's Office trained officers to look for movement in the cell and other signs of life. Officers were then to document in a logbook what the inmate was doing.

In his first sight check after Mr. Willis was placed in the cell, Newkirk documented Mr. Willis was "awake." [Doc. No. 130-10]. After Newkirk completed this sight-check, Ward relieved him for his lunch break; Ward completed five sight-checks in the one hour he relieved Newkirk. Initially, Ward documented that Mr. Willis was "laying." *Id.* His next two entries record Mr. Willis as "sitting," and he told investigators Mr. Willis was seated on the floor with his back and shoulders against the wall. *Id.*; Oklahoma County Sheriff's Office Case Book p. 29 [Doc. No. 172-2]. Ward's final two logbook entries describe Mr. Willis as "laying." [Doc. No. 130-10].

Upon his return from his lunch break, Newkirk resumed conducting sight checks on the 13th floor. Newkirk initially told investigators that Mr. Willis appeared to be lying on his stomach in the same position as when Newkirk left for his lunch break. OCSO Case Book p. 23 [Doc. No. 172-2]. But in his deposition, Newkirk testified that, upon his return from lunch, Mr. Willis had moved closer to the door and was lying on his back. Newkirk Dep. 69:8–71:5 [Doc. No. 129-7].

Surveillance video footage of the pod shows Newkirk completing his post-lunch sight-checks. DVD Containing Surveillance Video Files [Doc. Nos. 160-12 and 175]. For one sight-check, Newkirk appears to look inside cell 13C-03 three separate times. *Id.* On multiple occasions, he kicked or knocked Mr. Willis's cell door; Newkirk explained he would do this when a detainee appeared to be sleeping to "get some sort of movement or reaction from" the detainee. *Id.*; Newkirk Dep. 19:1–6 [Doc. No. 129-7]. Newkirk also explained that if kicking or knocking did not evoke any reaction from the detainee, an officer should then call for a nurse and gurney. Newkirk Dep. 19:11–20 [Doc. No. 129-7]. Paul Harmon, the investigator for the Oklahoma County Sheriff's Office who interviewed Newkirk, testified that he asked Newkirk what response Mr. Willis gave to the knocks and kicks on the door; Newkirk told Harmon Mr. Willis gave no response. Harmon Dep. 122:2–8 [Doc. No. 171-10]. Newkirk continued his sight checks.

Newkirk also told Harmon it was difficult to determine if Mr. Willis was breathing. OCSO Case Book p. 23 [Doc. No. 172-2]. Nearly two hours after he returned from his lunch break, Newkirk asked Williamson and another officer to look at Mr. Willis; he wanted their opinions on whether it looked like Mr. Willis was breathing. *Id.* at p. 23–24. Williamson testified that Newkirk asked her to look at Mr. Willis's position because he had been lying "in the same weird position." Williamson Dep. 22:16–23:1 [Doc. No. 163-8]. Williamson peered into the cell, "looked at the position, and walked off." *Id.* She testified that she did not look to see if Mr. Willis was breathing. *Id.* at 23:22–23. Ultimately, neither Williamson nor the other officer Newkirk asked to look at Mr. Willis gave Newkirk

a definitive answer as to whether Mr. Willis was breathing. OCSO Case Book p. 23–24 [Doc. No. 172-2]. Newkirk continued his sight checks.

Three hours later, a detention center nurse arrived to dispense medication to an inmate in pod 13C. When the nurse finished dispensing the medication and was about to leave the pod, Newkirk told the nurse that he had been concerned about Mr. Willis for some time. Yebit OSBI Interview at p. 132 [Doc. Nos. 171-5 and 172-1]. Newkirk opened cell 13C-03, and the nurse entered. Mr. Willis was unresponsive, and the nurse told Newkirk to call for a gurney. Resuscitation measures by detention center staff and paramedics proved unsuccessful. Shortly thereafter, Mr. Willis was pronounced dead in cell 13C-03.

An autopsy performed by Dr. Edana Stroberg, a forensic pathologist at the Office of the Chief Medical Examiner in Oklahoma City, revealed a significant injury to Mr. Willis's back. His spine was separated between the fifth and sixth thoracic vertebrae, which "is about halfway from the top and the bottom of [the] spine," and his spinal cord "was almost completely transected." Stroberg Dep. 28:12–29:4 [Doc. No. 173-23]. Dr. Stroberg concluded that Mr. Willis's cause of death was blunt force trauma to his thoracic spine.

Newkirk wrote "sleep" in the final 17 sight-check logbook entries for cell 13C-03. [Doc. No. 129-10].

## STANDARD OF DECISION

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986); *Universal Underwriters Ins. Co. v. Winton*, 818 F. 3d 1103, 1105 (10th Cir. 2016). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). If the movant carries the burden of demonstrating an absence of a dispute as to material fact, "the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial." *Martin v. City of Oklahoma City*, 180 F. Supp. 3d 978, 983 (W.D. Okla. 2016) (citing *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

The Court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," *Anderson*, 477 U.S. at 254, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. Although the Court views all facts in the light most favorable to the nonmoving party at the summary judgment stage, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citations omitted).

"[I]n opposing a motion for summary judgment, the non-moving party 'cannot rest on ignorance of facts, on speculation, or on suspicion.'" *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)). The nonmoving party "must present affirmative evidence in order to defeat a

properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257.

## DISCUSSION

I.   **Defendant Newkirk is not entitled to qualified immunity, but Plaintiff does not provide evidence showing Defendants Williamson and Ward violated Mr. Willis's constitutional rights.**

### A.  Qualified Immunity Standard

The purpose of qualified immunity is "to insulate public officials 'from undue interference with their duties and from potentially disabling threats of liability.' " *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1199 (10th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). Qualified immunity is intended to "protect 'government officials performing discretionary functions' and shield[ ] them from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow*, 457 U.S. at 818). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Newkirk, Williamson, and Ward assert that they are entitled to qualified immunity as to Plaintiff's Fourteenth Amendment deliberate indifference denial of medical care claim against them. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional

right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Although the evidence is viewed in the light most favorable to the nonmoving party, the "record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

### B. Constitutional Violation

The Fourteenth Amendment's Due Process Clause affords a pretrial detainee protection against deliberate indifference to a substantial risk of serious harm. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Burke v. Regalado*, 935 F.3d 960, 991–92 (10th Cir. 2019); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 2018). "[P]rison guards may thus be liable under § 1983 for 'indifference . . . manifested . . . in their response to the prisoner's needs or by . . . intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed.'" *Est. of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

The "[d]eliberate indifference [standard] has objective and subjective components." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component is met where the medical need is "'sufficiently serious'" such that it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Est. of Booker*, 745 F.3d at 430 (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

To satisfy the subjective component, Plaintiff must show the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The official "must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006). "The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (quoting *Mata*, 427 F.3d at 753).

Defendants do not seriously challenge Plaintiff's ability to meet the objective component. Plaintiff provides evidence showing Mr. Willis suffered a fatal injury to his spine, and some evidence suggests he lay face-down in a prone position for nearly six hours without moving positions.[1] There is also evidence showing it was difficult for the officers to discern whether Mr. Willis was breathing. Plaintiff provides sufficient evidence for a reasonable jury to conclude Mr. Willis's medical need was so obvious a layperson would easily recognize the need for a doctor's attention.

Defendants, however, do challenge Plaintiff's ability to show evidence that they knew of and disregarded that obvious medical need. Each argues there is no evidence they were subjectively aware that Mr. Willis was subject to a serious risk and that, even if they were aware of Mr. Willis's medical need, they did not deliberately ignore it. The Court must analyze the conduct of each Defendant individually.

### 1. Defendant James Newkirk

---

[1] Plaintiff offers two qualified experts that opine that Officer Johnson's use of the three-point stabilization technique caused Mr. Willis's spinal injuries. Bux Report at p.4 [Doc. No. 171-14]; Ziejewski Report at p. 17 [Doc. No. 171-8]. Dr. Edana Stroberg and Dr. Robert Bux, both forensic pathologists, testified that once Mr. Willis suffered this injury, he would have experienced paralysis from the chest down. Stroberg Dep. 32:7–33:6 [Doc. No. 173-23]; Bux Dep. 75:24–76:9 [Doc. No. 171-7].

The facts, taken in the light most favorable to Plaintiff, show Newkirk subjectively perceived Mr. Willis's need for medical care. First, Plaintiff provides sufficient evidence showing Newkirk was aware of facts from which he could have drawn an inference that Mr. Willis was subject to a substantial risk of serious harm. Some evidence suggests Mr. Willis did not move positions for nearly six hours, and Newkirk conducted sight-checks for most of that period. Newkirk also stated it was difficult to see if Mr. Willis was breathing. He asked two other detention officers to look at Mr. Willis to get a second and third opinion on Mr. Willis's well-being. Specifically, he asked the officers whether they thought Willis was breathing; neither officer gave him a clear "yes" answer. Three hours later, Newkirk asked a nurse, who just happened to be in the pod, for a fourth opinion on Mr. Willis's well-being. This evidence is sufficient for a jury to find Newkirk could have drawn an inference that a significant risk to Mr. Willis's well-being existed. In fact, Plaintiff provides sufficient evidence showing Newkirk did draw that inference and disregard it.

The video surveillance of Newkirk's sight checks shows his outward concern for Mr. Willis. At one point he looked into Mr. Willis's cell three times before logging the sight-check, and he knocked and kicked the cell door numerous times. Newkirk told an investigator Mr. Willis did not respond to the kicks and knocks on the cell door. He also testified that, when knocking does not evoke a reaction, officers are trained to call for a nurse and gurney. But Newkirk did not call for a gurney until after the nurse directed him to, nearly three-and-a-half hours after he first kicked the cell door. "Although not dispositive, an official's training may undermine his or her claim that he or she was unaware

of such a risk." *Est. of Booker*, 745 F.3d at 430. The facts, when viewed in the light most favorable to Plaintiff, show that a reasonable jury could find Mr. Willis's symptoms were such that Newkirk knew there was an excessive risk to his health and Newkirk disregarded that risk.

Despite his obvious concern for Willis's need for medical care, Newkirk continued his sight checks. Plaintiff has provided evidence that Newkirk manifested indifference in response to Mr. Willis's obvious need for medical attention. The facts, thus, demonstrate that Newkirk violated Mr. Willis's Fourth Amendment right to custodial medical care.

### 2.  Defendant Tiffany Williamson

The facts, however, do not show Williamson subjectively perceived Mr. Willis's need for medical care. Williamson arrived for work at the detention center over two hours after officers took Mr. Willis to cell 13C-03, and she had very little interaction with Mr. Willis. Unlike Newkirk—who conducted sight-checks on Mr. Willis for nearly five hours, looking into the cell over 19 times—Williamson looked in Mr. Willis's cell once. She testified that Newkirk asked her to look into the cell to check Mr. Willis's position; Newkirk told investigators he wanted reassurance Mr. Willis was breathing. Williamson testified that she looked at Mr. Willis's position and left; she did not look for breathing or signs of life. Although this evidence could show she negligently performed her duty to check on Mr. Willis's well-being, "[d]eliberate indifference has been routinely defined by

the Supreme Court to be more than negligence." *Est. of Grubbs v. Hernandez*, No. 18-1358, 2021 WL 4239021, at *7 (10th Cir. Sept. 17, 2021) (unpublished) (collecting cases).

Williamson knew very little about Mr. Willis. A significant factor in concluding sufficient evidence exists for a reasonable jury to find Newkirk was subjectively aware of the risk to Mr. Willis's health is that he witnessed Mr. Willis's condition over an extended period of time. Williamson saw Mr. Willis once. There is, thus, insufficient evidence showing Williamson was aware of facts from which the inference could be drawn that a substantial risk of serious harm to Mr. Willis's health existed or that she drew that inference. Williamson is entitled to qualified immunity; her motion for summary judgment is therefore granted.

### 3. Defendant Kody Ward

Ward's conduct falls closer to deliberate indifference than Williamson's, but the evidence does not show Ward subjectively perceived, and disregarded, Mr. Willis's risk of a fatal medical condition. The parties dispute whether Mr. Willis changed positions in the hour Ward was assigned to perform sight-checks. Ward twice documented that Mr. Willis was sitting. But qualified experts opine that Mr. Willis's spinal injuries would have immediately caused paralysis below his chest, meaning he would have been unable to sit up against the wall in the way Ward described. Further, Newkirk gave inconsistent statements on whether Mr. Willis had changed positions during his one-hour lunch break. Still, Ward—like Williamson—had relatively limited exposure to Mr. Willis's condition. He covered Newkirk's sight-checks for an hour, starting just thirty minutes after Mr. Willis was placed in the cell. Thus, even assuming Mr. Willis did not move positions in the hour

Ward conducted sight-checks, Ward did not have the benefit of several hours, as did Newkirk, to determine whether the lack of movement was caused by a fatal injury or, rather, if Mr. Willis was merely sleeping. The limited period of time for Ward to observe Mr. Willis, combined with the fact that Ward started his sight-checks less than an hour after Mr. Willis likely suffered the injuries to his spine, shows Ward was not aware of facts from which he could have drawn an inference that Mr. Willis was subject to a substantial risk of a fatal medical condition.

Nonetheless, Ward did observe that Mr. Willis was "hurting." Ward told an investigator it looked to him like Mr. Willis was hurting due to what Ward thought was PCP withdrawal. Once Ward noticed that Mr. Willis was hurting, his training dictated that he initiate contact with Mr. Willis and, if Mr. Willis did not respond, notify a supervisor or medical professional. Carter Dep. 81:5–21 [Doc. No. 161-10]. But Ward did not contact Mr. Willis. Instead, he continued his sight-checks until Newkirk returned. To be sure, these facts tend to show Ward negligently performed his duty to check on Mr. Willis's well-being. Deliberate indifference, however, requires conduct that is more than negligent. *See Est. of Grubbs,* 2021 WL 4239021, at *7. There is, thus, insufficient evidence showing Ward, in fact, drew an inference that Mr. Willis was subject to a substantial risk of a fatal medical condition or that he disregarded that risk. Therefore, Ward is entitled to qualified immunity; his motion for summary judgment is granted.

### C. Clearly Established Right

To overcome the defense of qualified immunity, Plaintiff must additionally show that Newkirk's actions violated clearly established law. "The law is clearly established

when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). "The precedent is considered on point if it involves materially similar conduct or applies with obvious clarity to the conduct at issue." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (internal quotation and emphasis omitted). Courts must take care not to define clearly established law "at a high level of generality" and should instead determine "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations and citation omitted).

Ultimately, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), modified on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 240-43 (2009). "The key to the analysis is notice—an official somehow must be on notice that the conduct in question could violate the plaintiff's constitutional rights." *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001). A case "directly on point" is not necessary, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12, (internal quotation and citation omitted). In this regard, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (internal citation omitted).

The Court is mindful that a clearly established right is not to be defined "at a high level of generality," but "general statements of the law are not inherently incapable of

giving fair and clear warning to officers," as long as the unlawfulness is apparent "in light of pre-existing law." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations and quotations omitted).

In the Tenth Circuit, "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). Unconstitutional "denial of medical attention" may be shown by establishing the defendant committed "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (quoting *Estelle*, 429 U.S. at 106); *see also Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1033 (10th Cir. 2020) ("[P]rior to January 2016, it was clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights.").

Tenth Circuit precedent places the question of whether Newkirk's conduct violated Mr. Willis's clearly established rights "beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Newkirk was on notice that disregarding Mr. Willis's obvious need for medical attention would violate Mr. Willis's constitutional rights. Therefore, Newkirk is not entitled to qualified immunity.

Where, as here, "'disputed material facts implicate [both] of the two questions of whether a serious medical need existed [and] whether an officer was deliberately indifferent to it, a court may not grant summary judgment.'" *Est. of Booker*, 745 F.3d at 434 (10th Cir. 2014) (quoting *Olsen*, 312 F.3d at 1315). Accordingly, the Court denies

Newkirk's motion for summary judgment on Plaintiff's deliberate indifference denial of medical care claim.

## II.   As to Defendant Newkirk, Plaintiff provides sufficient evidence to submit the issue of punitive damages to the jury.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Newkirk argues there is insufficient evidence to submit the issue of punitive damages to the jury.

"'[R]eckless or callous indifference' requires that the defendant have acted 'in the face of a perceived risk that its actions will violate federal law.'" *Eisenhour v. Cnty.*, 897 F.3d 1272, 1281 (10th Cir. 2018) (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999)). "With respect to punitive damages, '[a] finding of deliberate indifference to a serious medical need, while establishing liability under § 1983, does not necessitate a finding of callous indifference warranting punitive damages.'" *Bevan v. Valencia*, No. CV 15-0073 KG/SCY, 2018 WL 4208065, at *5 (D.N.M. Sept. 4, 2018) (quoting *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997). "The focus must be on whether the defendant's actions call for 'deterrence and punishment over and above that provided by compensatory awards.'" *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (quoting *Smith*, 461 U.S. at 54).

Plaintiff has offered no evidence showing that Newkirk intentionally and maliciously denied Mr. Willis adequate medical care. But Plaintiff does provide sufficient

evidence for a reasonable jury to find Newkirk manifested some degree of indifference in response to Mr. Willis's obvious need for medical attention.

Viewing the facts in a light most favorable to Plaintiff, the Court is unable to declare Newkirk did not act with callous or reckless indifference towards Mr. Willis's constitutional rights. A jury could conclude Newkirk did not violate Mr. Willis's constitutional rights. Or it could conclude they acted with indifference, but not reckless or callous indifference, towards Mr. Willis's obvious medical need. But the jury must assess whether the evidence establishes that Newkirk's conduct calls for deterrence and punishment over that provided by compensatory awards. The Court, therefore, denies Newkirk's motions for summary judgment on the issue of punitive damages.

## CONCLUSION

For these reasons, the Court finds that Defendant James Daniel Newkirk is not entitled to summary judgment on Plaintiff's deliberate indifference denial of medical care claims or on the issue of punitive damages. The Court further finds that Defendants Tiffany Williamson and Kody Ward are entitled to summary judgment on Plaintiff's deliberate indifference denial of medical care claims and on the issue of punitive damages.

**IT IS THEREFORE ORDERED** that Defendant James Daniel Newkirk's Motion for Summary Judgment [Doc. No. 129] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Tiffany Williamson's Motion for Summary Judgment [Doc. No. 123] is **GRANTED**.

**IT IS FURTHER ODRERED** that Defendant Kody Ward's Motion for Summary Judgment [Doc. No. 121] is **GRANTED**.

**IT IS SO ORDERED** this 1st day of February, 2022.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge